# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>vs.<br><br>CHARLES E. HOPE and MICHELLE DENISE WILCOX,<br><br>                    Defendant. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON MOTION TO SUPPRESS**<br><br>Case No. 2:06CR571DAK |

      This matter is before the court on Defendant Michelle Denise Wilcox's Motion to Suppress [Docket No. 24], and Defendant Charles E. Hope's Motion to Suppress [Docket No. 32]. The court held an evidentiary hearing on the motions on November 14, 2007, and closing arguments on January 4, 2008. At the hearings, both Defendants appeared, and Defendant Wilcox was represented by Mary C. Corporan and Defendant Hope was represented by Viviana Ramirez. Plaintiff was represented at both hearings by Vernon G. Stejskal. The court has carefully considered all pleadings, memoranda, and other materials submitted by the parties as well as the law and facts relating to these motions. Now being fully advised, the court renders the following Findings of Fact, Conclusions of Law, and Order on Defendants' motions to suppress.

## FINDINGS OF FACT

On June 27, 2007, a call was placed with the West Valley Police Department to respond to a possible mental health subject. The caller indicated that a man outside a residence was waiving a machete. There were reports that the man was making threatening comments that he wanted to kill someone, but there were no reports of anyone injured. Officers arrived to observe a man sitting on the front porch of a home holding a sword.

Officer Richard Gardner was the first officer to respond to the scene. When he arrived, he ordered the man on the porch to drop his sword. The man immediately complied, and Officer Gardner retrieved the sword. Officer Gardner spoke with the man, later identified as Brian Ritchie, and determined almost immediately that Ritchie was extremely intoxicated and suicidal. There was a strong odor of alcohol and Ritchie had a bottle of alcohol with him. Ritchie was slurring his words and had trouble walking as he was later escorted off of the property. Ritchie first expressed to Officer Gardner his desire to kill someone and then a desire to kill himself.

When questioned by Officer Gardner, Ritchie stated that he lived in the house with two roommates and that he lived upstairs. Ritchie then stated that he didn't think that anyone else was in the residence. Officer Gardner observed that the front door to the residence was open. Officer Gardner did not see anyone else enter or exit the home, nor did he hear any sounds coming from the residence. Officer Gardner did not see any blood or tissue, either on Ritchie or on the sword he had dropped, or in or around the premises. The Officer did not smell any suspicious odors.

Officers Arnold and Cordova arrived at the scene while Officer Gardner was speaking with Ritchie. They aided in frisking and securing Ritchie. Officer Arnold removed the bottle of

alcohol from Ritchie. Ritchie again indicted that he wanted to kill himself, he hated his life, he had no money, and was being evicted from his residence. Mr. Ritchie told the officers that he lived in the residence with Defendant Wilcox and her boyfriend. Once he was secured, Officer Gardner asked Ritchie for consent to enter the home to make sure no one was hurt or that there was no one else in the residence who could pose a threat to the officers. Mr. Ritchie gave his consent to enter the home.

Officers Gardner and Cordova entered the home to conduct a protective sweep. Upon entering the home, the officers announced their presence and requested that anyone inside the residence identify themselves, to which no one answered. The police saw, heard and smelled nothing suspicious in the upstairs of the home.

The officers searched upstairs where Ritchie had indicated he lived. Officer Gardner estimated the search took three to five minutes. Finding no one and nothing suspicious, the officers proceeded down the stairs to the basement. The stairwell to the basement was open to the upstairs of the house. When the officers went down the stairs to the basement, they did not encounter any blood or tissue on the stairs or at the bottom of the stairs, or hear anyone calling out.

In the basement, the officers encountered a man, later identified as defendant, Charles Hope. Hope did not exhibit any sign of injury nor appear to be sick. The officers did not observe any blood or tissue on Hope. When the officers encountered Hope, Officer Cordova conducted a *Terry* frisk of Hope and found only a pocket knife. The officers did not ask Mr. Hope for consent to search the basement portion of the residence.

Officer Cordova escorted Hope outside, and Officer Gardner continued to search the

basement. During his continued searching, Officer Gardner did not smell any suspicious odor. Officer Gardner looked into all of the rooms in the basement including a laundry room, a computer room, a bedroom, and a bathroom. Upon opening the bathroom door, Officer Gardner observed what he believed to be the makings of a clandestine methamphetamine laboratory. He noticed glassware in the sink, a cooker plate with sand in it, some beakers, a bottle with white powdery substance in it, and a garbage bag with a hose taped to it.

Officer Gardner exited the residence and reported what he saw to the other officers. The officers placed Ritchie and Hope in custody. Officer Arnold, who had extensive training in identifying methamphetamine laboratories proceeded to the downstairs bathroom to verify that what Officer Gardner had seen was an operational methamphetamine laboratory. Arnold confirmed that the bathroom contained a methamphetamine laboratory, and the officers secured the residence. The officers then obtained a search warrant pursuant to which the methamphetamine laboratory was seized.

Following execution of the search warrant and cleanup of the methamphetamine laboratory on June 27, 2006, the Health Department closed the residence to entry and posted signs around the outside and on the front door of the residence indicating that the residence was closed due to health code violations.

On June 30, 2006, Officers Arnold and Cheshire responded to the same address in West Valley, Utah, in response to a call from a concerned neighbor indicating that two females were entering the home. When Officer Cheshire arrived at the scene ten minutes after Officer Arnold, two females were already detained, one of whom was later identified as defendant, Michelle Wilcox. Officer Cheshire had previously spoken with Detective Attridge, the case agent in the

methamphetamine lab case, who indicated that Wilcox was a part of his investigation because she was one of the residents. Detective Attridge asked Officer Cheshire to conduct an interview with Wilcox if she was at the scene on June 30, 2006.

Officer Cheshire first contacted Wilcox on the sidewalk outside the residence. Wilcox appeared to be detained by Officer Arnold for trespassing. However, Officer Cheshire had not seen Ms. Wilcox enter the home. No witness was called at the suppression hearing who had seen her enter the home. Officer Cheshire informed Wilcox that she could not enter the residence with the posted sign from the health department. Wilcox indicated she understood, but that she needed to get a change of clothes out of the residence. She told the officers that all her clothing and personal effects were in the home.

Officer Cheshire believed that Wilcox was being detained for trespassing and was not free to leave. Officer Cheshire asked Ms. Wilcox to get into his patrol car and he read her *Miranda* rights from a *Miranda* warning card. She stated she understood. He then asked Ms. Wilcox if he could interview her, and she agreed. Wilcox and her Hope were later charged with Manufacture or Attempted Manufacture of Methamphetamine, in violation of 21 U.S.C. § 841 (a)(1), and Possession of List I Chemicals, in violation of 21 U.S.C. § 841 ( c).

## CONCLUSIONS OF LAW

I.   **Search of the Home**

Both defendants assert that the search of the home was unlawful. The government, however, contends that the search of the home was valid based on Ritchie's consent and exigent circumstances.

### A. Protective Sweep

The Fourth Amendment generally requires law enforcement to obtain a search warrant based upon probable cause before searching or seizing a person's property. There is, however, an exception for a protective sweep, which is a quick and limited search of a premises, incident to arrest, to "protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325,327 (1990). Such a search is "appropriate only where officers reasonably perceive an immediate danger to their safety," and such a perception must be based on "specific and articulable facts, taken together with the rational inference from those facts... that the area swept harbor[s] an individual posing a danger to the officers or others." *United States v. Owens*, 782 F.2d 146,151 (10th Cir. 1986); *United States v. Garza*, 125 Fed Appx. 927 (10th Cir. 2005)(recognizing that a protective sweep may only be performed incident to an arrest); *United States v. Davis*, 290 F. 3d 1239, 1242 n.4 (10th Cir. 2002) (rejecting argument that a protective sweep could occur before an arrest); *Unites States v. Soria,* 959 F.2d 855 (10th Cir. 1992) ("Protective sweep is not a full search, but rather a quick cursory inspection of premises following arrest"); *United States v. Franklin*, 176 F.3d 489 (10th Cir. 1999) ("arresting officer permitted to take reasonable steps to ensure their safety after, and while, making the arrest"); *United States v. Smith*, 131 F. 3d 1392 (10th Cir. 1997 (emphasis added) ("Protective Sweep is a brief search of the premises during arrest.")

For there to be a lawful protective sweep, there must also be a valid basis for the search in addition to a valid arrest. Officers must have a reasonable belief based on specific and articulable facts, taken together with the rational inference from those facts, that the arrest area harbors an individual posing a danger to the officer or others before they can conduct a protective

sweep. *Buie*, 494 U.S. 325; *Owens*, 782 F.2d at 151 (protective sweep "appropriate only where officers reasonably perceive an immediate danger to their safety.")  An arrest alone does not validate a search - more is needed. *Buie*, 494 U.S. 334, n.2.  In addition, a lack of information as to any potential dangers does not validate the search. *Buie*, 494 U.S. 325 ("[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep.") *United States v. Colbert*, 76 F.3d 773 (6th Cir 1996) (protective sweep unjustified in part because the arresting officer "testified that he 'didn't have any information at all' when asked wither he had information that anyone was inside the ...apartment prior to his decision to conduct the protective sweep"); *United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004)("Of course, there could always be a dangerous person concealed within a structure.  But that in itself cannot justify a protective sweep."); *United stated v. Delgadillo-Velasquez*, 856 F.2d 1292, 1298 (9th Cir. 1988) (protective sweep was unconstitutional where officers had "no information that any other persons were in the apartment.")

In the instant case, the first requirement of a protective sweep is satisfied.  Although no arrest had actually occurred prior to the search of the home, defendants concede that probable cause existed to arrest Ritchie at the time that the officers conducted the search.  Both Ritchie and Hope were arrested following the search.  However, officers did not and could not have had a reasonable belief, based on specific and articulable facts, that the home harbored an individual posing a danger to the officer or others.  First, Mr. Ritchie told officers that, even though he lived with roommates, no one was currently in the residence.  Second, the front door to the home was open and officers did not observe anyone in the home, nor did they see anything suspicious.  They did not hear anything from inside, nor was there any sign of blood or tissue on Ritchie or

his sword to indicate that someone was hurt inside.  Third, when officers announced their presence and requested identification of anyone in the home, no one answered.  Fourth, officers did not see, hear or smell anything while searching the upper floor that indicated another person was in the home, nor was there any other indication that another person was in the home or may be hurt.  The officers did not see any blood or tissue anywhere in the upstairs.

Finally, Ritchie indicated on several occasions that he was suicidal.  "The facts upon which officers may justify a *Buie* protective sweep are those facts giving rise to a suspicion of danger from attack by a third party during an arrest, not the dangerousness of the arrested individual."  *Colbert*, 76 F.3d at 777.  Here, there was nothing to suggest to the officers that any individual remained in the home, let alone that one remained who might pose a danger to the officers or others.  In fact, the officers themselves stated that they entered the home solely for the safety of the possible residents of the home.  Accordingly, there was no reasonable and articulable basis to perform a protective sweep of the home for officer safety.

More importantly, Ritchie and the arrest area were all outside the home from the moment officers arrived.  Officers entered and searched inside the home.  Although an inside search may follow an outside arrest, there still must be a reasonable belief that the arrest area harbors an individual who poses a danger to the officers.  *Buie*, 494 U.S. 325; *Owens*, 782 F.2d at 151.  An officer's lack of information as to what is inside a home does not validate an in-home search when the arrest occurs outside.  *Buie*, 494 U.S. 325; *Colbert*, 76 F.3d 778; *Carter*, 360 F.3d at 1242-43; *Delgadillo-Velasquez*, 856 F.2d at 1298.  In the instant case, the officers had no reason to believe anyone was still in the home who could pose a danger.  Ritchie told the officers that no one was in the home, and the officers testified there were no sounds or smells coming from the

home.  Nobody was visible in the home, despite the door being open, and no one responded to the officers when they called into the home.  All evidence before the officers at the time indicated that the home was empty.  There is no evidence that suggests a dangerous individual was inside the home which would authorize the officers' entry.  Absent a reasonable and articulable suspicion of such an individual existing, the officers could not enter the home to conduct a protective sweep for officer safety.

The government argues that the search was based on the possibility that an occupant may be injured.  The officers, however, had no evidence of a fight or other violent crimes.  The telephone call to police informed them that the person yelling was outside that he wanted to kill someone.  Even if the police were justified in making sure that any occupants in the house were safe, the need for a protective sweep would have ceased when they encountered Hope downstairs in the basement.  It was obvious that Hope was not injured and not a threat.  Unlike Ritchie, Hope was not intoxicated.  Hope indicated that nobody else was in the house.  Therefore, the court concludes that the officers should have stopped the protective sweep when they encountered Hope and escorted him out of the house.  The continued search of the basement was unlawful.  Accordingly, the "fruits" obtained during the unlawful search of the home and after its completion must be suppressed.

**B.    Consent**

A warrantless search may be lawfully conducted when it is supported by consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).  To make a determination of valid consent, the court must look to the totality of the circumstances.  For consent to be valid, it must be "specific and freely and intelligently given [and] the government must show that the police

did not coerce the defendant into granting his consent." *United States v. Pena-Sarabia*, 297 F.3d 983, 986 (10th Cir. 2002); *United States v. Contreras*, 2007 WL 3173964 (10th Cir. 2007)("the central question in determining whether consent to a search is voluntary is 'whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' request.'"). The Government bears this burden. *Id.*

A deficient mental state may invalidate consent. *Id.*; *United States v. Sims*, 428 F.3d 945, 953 (10th Cir. 2005);. The Court should consider such factors as Mr. Ritchie's mental state, whether he was in custody when consent was requested, the age and intelligence of the person giving consent, his chemical intoxication (if any), whether he was informed of the right to withhold consent, and whether he generally understood the rights enjoyed by those under investigation when determining whether consent is voluntary. *United States v. Mendez,* 118 F.3d 1426 (10th Cir. 1997). But, courts have recognized that consent to search may be voluntary even though the consenting party is being detained at the time the consent is given, and law enforcement agents fail to advise him of his *Miranda* rights." *United States v. Dozal*, 173 F.3d 787, 796 (10th Cir. 1999).

In the instant case, Ritchie was extremely intoxicated, slurring his speech, weaving when walking, and having great difficulty walking or standing. Ritchie was also exhibiting wild mood swings and telling officers he wanted to kill himself. He was originally identified by dispatch as a possible mental health subject because of his bizarre behavior. Officer Gardner testified that Ritchie was detained prior to the protective sweep and not free to leave but had not been informed of his rights. While detention and a failure to Mirandize an individual are not necessary, a combination of the factors suggest that Ritchie was unable to understand what was

occurring. Ritchie was not informed that he could refuse his consent. His extreme intoxication, in combination with his depressed and suicidal state of mind, combined with his being in custody, demonstrate that Ritchie was unaware of the consequences of giving his consent. Therefore, the court concludes that Ritchie did not freely and intelligently consent to the search of the home.

Even if Ritchie's consent was freely and voluntarily given, his consent was limited to the upstairs portion of the home. Ritchie clearly told the officers that he shared the house with roommates and that he lived upstairs. The officers exceeded the scope of any consent when they entered and searched the bathroom in the basement. A third party may consent to a search of an area over which the third party and the defendant both have a privacy interest. *United States v. Matlock*, 415 U.S. 164 (1974); *United States v. Rith*, 164 F.3d 1323 (10th Cir. 1999). Such consent is limited and does not authorize a search of areas accessible only to the defendant. *Matlock*, 415 U.S. at 171 n. 7 (common authority over property such that parties may consent to a search rests on mutual use of the property by persons generally giving joint access or control for the most purposes); *United States v. Dozal*, 173 F.3d 787 (10th Cir. 1999)(where two men shared an apartment and one consented to its search, that search was limited to the bedroom of the consenting party and the common areas.); *United States v. Brock*, 417 F.3d 692, 697 (7th Cir. 2005) (roommate could consent to search of common areas, but defendant"s bedroom remained private); *United States v. Davis*, 967 F.2d 84, 86-87 (2d Cir. 1992) (third-party consent to search will validate the search if two prongs are present; first, the third party had access to the area searched, and second he had either: (a) common authority over the area; or (b) a substantial interest in the area; or, ( 3) permission to gain access).

In this case, Ritchie indicated several times that he only occupied the upper portion of the house. Thus, officers could not reasonablely or in good faith rely on Ritchie's consent to search the entire home. All of the officers involved heard Mr. Ritchie state that he lived in the upper portion of the home, not in the basement. Therefore, there was no issue with a lack of communication between Ritchie and the officers or between the officers themselves. Given that Ritchie specifically stated that he lived in the upper portion of the home, it is unreasonable for the officers to assert reliance on his consent as a basis for searching the entire home. Ritchie could not provide third-party consent to a search of rooms in the basement. When the officers encountered Hope in the basement, they failed to ask for his consent to continue their search in the rest of the basement. Therefore, the court concludes that the search of the basement bathroom was unlawful. Accordingly, all "fruits" obtained pursuant to such unlawful search are suppressed.

## II.     Wilcox's Statements

Wilcox asserts that all statements made by her to any law enforcement officers at any time must be suppressed because they were obtained in violation of the Defendant's Fourth and Fifth Amendment rights. Based on the above rulings, the court finds that Wilcox has established the requisite Fourth Amendment violation. In order for the statements to be suppressed based on the Fourth Amendment violation, Wilcox must show a "factual nexus between the illegality and the challenged evidence," i.e., her statements. *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000). The court finds that the statements sought to be suppressed would not have come to light but for the officers' unconstitutional search. In this case, there is no evidence that the evidence would have been inevitably discovered or discovered by independent means.

The court further finds that the statements are not too attenuated from the search as to dissipate any taint. Because of the search and the closure of the residence, Wilcox was attempting to obtain clothing from the residence when the officers detained and interviewed her. While a period of days had elapsed, the court finds the situation sufficiently connected to find that the statements were a product of the illegal search. Accordingly, the court finds Wilcox's statements to be "fruits of the poisonous tree." For the foregoing reasons, Wilcox's inculpatory declarations made to the officers are suppressed.[1]

## CONCLUSION

Based on the above reasoning, Defendants' motions to suppress are GRANTED. The court suppresses all evidence taken during the unlawful search of the home and the subsequent statements Wilcox made to officers.

DATED this 29th day of January, 2008.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

---

[1] With respect to the Fifth Amendment issues, the court finds no *Miranda* violations.